IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2001

## STATE OF TENNESSEE v. DENNIS MORGAN

**Appeal from the Criminal Court for Shelby County**
**No. 98-04904      John P. Colton, Jr., Judge**

---

### No. W2001-00125-CCA-R3-CD  - Filed March 27, 2002

---

The defendant, Dennis V. Morgan, was convicted of second degree murder. The trial court imposed a Range I sentence of seventeen years. In this appeal of right, the defendant asserts that the trial court erred in its instruction on self-defense. The judgment of the trial court is reversed and the cause is remanded for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed and Remanded**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. DAVID G. HAYES, J., filed a dissenting opinion.

Leslie Irwin Ballin and Gray W. Bartlett, Memphis, Tennessee, for the appellant, Dennis V. Morgan.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Thomas Hoover and Steven Hall, Assistant District Attorneys General, for the appellee, the State of Tennessee.

### OPINION

At approximately 11:00 P.M. on September 4, 1997, Officer David Payne of the Shelby County Sheriff's Department was dispatched to a Kroger parking lot to investigate the report of an individual being held for suspicion of motor vehicle theft. On the way to the scene, Officer Payne received a second report indicating that shots had been fired. When he arrived, Officer Payne, who was accompanied by an officer in training, stopped three white male teenagers as they ran across the parking lot. Shortly thereafter, the defendant approached Officer Payne and explained that he had just shot someone.

The defendant led officers to an area near a maroon Toyota truck, where the victim, Greg Waddell, was lying face down on the ground. The defendant, who had been drinking, appeared distraught. At trial, Officer Payne, testified that he had "the impression" that the defendant feared for his life.

Officer R. Hubbard transported the defendant to the jail. On the way, the defendant claimed that he was fearful because the victim had threatened him and his family. Officer J.D. Moore, who was involved in the investigation of the crime scene, testified that he overheard the defendant say that he shot the victim because the victim had stolen his truck. Officer Joe Everson testified that he observed a hammer located between the seats of the truck being driven by the victim.

Christina Bruno and Kimberly Cox were driving in the parking lot where the victim was shot. At trial, Ms. Bruno testified that she saw the defendant standing over the victim, who was lying on his stomach in the parking lot. According to Ms. Bruno, she saw the defendant fire the gun toward the ground and believed that the man on the ground had been shot. On the following day, Ms. Bruno reported the incident to police. Ms. Cox testified that she saw a man, whom she could not identify, fire a gun toward the ground. She heard two shots.

Dr. O.C. Smith testified that the victim had been shot twice, once in the head and once in the chest. One shot entered the lower left portion of the head and exited through the cheek. Dr. Smith stated that the bullet traveled slightly upward as it exited the head. A second shot entered the back and traveled upward about three inches before exiting through the chest. Because there was no stipling or gun powder residue found on the victim's body, Dr. Smith concluded that both shots were fired from a distance greater than two feet. It was his opinion that the victim's wounds were consistent with the victim lying face down when shot. Dr. Smith could not determine whether the victim was moving when shot. The gunshot wound to the chest was the cause of death.

Wilson Roberts, Jr., a building contractor who testified on behalf of the defense, stated that he knew the victim and had known the defendant, who worked framing houses, for approximately twenty-five years. He recalled that in 1993, some four years before the shooting, the defendant allowed the victim, who had been incarcerated, to share his residence. According to Roberts, the victim had no other place to go and the defendant provided housing so he could save money to "get his own place."

Roberts recalled an occasion when he observed the victim become violent and threaten the defendant. He stated that the victim was "guzzling" from a bottle of Crown Royal and either tequila or vodka. Roberts explained that the defendant remarked to the victim he had had enough, took the Crown Royal from him, and put it away. According to Roberts, the victim became very hostile, "gritted his teeth and . . . barked out" that "if [the defendant] ever did that again, while he was drinking, he would kill him." Roberts described the victim's demeanor as "animalistic." Roberts' reaction was to inform the defendant that the victim would not work on any of his construction jobs. During cross-examination, Roberts conceded that he had observed the victim and the defendant together on several occasions but this was the only time that the victim had threatened violence.

The defendant, who met the victim in 1993, testified that his sister asked him to give the victim a job. When the victim needed a place to live, the defendant offered his residence. He confirmed the circumstances of the incident Roberts witnessed and testified that he asked the victim to leave on the next morning. The defendant also terminated the victim's employment. The

defendant recalled that several months later he saw the victim walking along the street and offered to give him a ride. In response, the victim "shot [him] the bird and told [him] to go the hell away."

The defendant testified that he next saw the victim in 1996. When the defendant learned that the victim was getting little work from his employer, he offered the victim a job, explaining that he believed the victim had "finally gotten his life together." A month later, the victim returned to work for the defendant. Afterward, the defendant learned that the victim was sleeping in a van because he had no place to live. The defendant invited the victim to return to his residence.

In late 1996, while the defendant was recovering from knee surgery, the victim continued to work with the defendant's son on various construction sites. While doing trim work on a house, the victim got into an argument with the defendant's son. Even though the victim struck his son in the back of the head with a two-by-four, causing a gash in the back of his head, the defendant allowed the victim to continue working for him and sharing his residence.

According to the defendant, the victim's work performance began to decline in the late spring and early summer of 1997. The victim stayed out all night and missed a significant amount of work. The defendant testified that the victim was drunk when he came home in the mornings and often was drunk when he reported to work. When the victim arrived at work in an intoxicated state in June of 1997, the defendant terminated his employment and ordered him to leave his residence. The victim asked to borrow the defendant's truck to move and the defendant agreed. The defendant understood that the victim was to return the truck after he finished moving. When the victim had not returned the truck over a month later, the defendant contacted the police. Several days after he made the report, the defendant received a call from his step-son, Mason, who said that he had found the victim and the truck. The victim led Mason, who was following him, into a dead end, slammed on his brakes, and jumped out of the truck. Mason informed the defendant that the victim came at him and threatened him. After the incident, the defendant obtained a warrant for the unauthorized use of a vehicle.

On the day of the shooting, the defendant, who was giving a ride to his son and two others, saw the victim and the truck in a parking lot. After seeing the truck, he decided to go to a nearby grocery store to call the police. The defendant followed the victim after he observed the truck pull out of the parking lot. The defendant recalled that the victim stopped the truck just inside a Kroger parking lot. When the victim left the vehicle, the defendant directed his son to go call the police. The defendant, who was armed with a pistol that belonged to his wife, then exited his vehicle. The defendant testified that the victim came toward him, threw something, and said, "I'm going to kick your ass." According to the defendant, he displayed his weapon, ordered the victim onto the ground and remarked, "It's too late for excuses, the law's coming."

The defendant testified that the victim lay on the ground for "a little while," then suddenly rolled over, cursed, and said, "you're not going to shoot me, I've got something for you in that truck and when I get to it I'm going to kill you and I'm going to kill your two sons." The defendant admitted that when the victim, who was "in a push-up" position, started to get up, he fired the gun.

The defendant claimed that he feared for his life, believing that the victim had a gun in the truck, only a few feet away. The defendant explained that when the victim took the truck, there was a rifle behind the seat. The defendant testified that after shooting the victim, he felt "sick," "disoriented," and "in shock." He then saw Officer Payne and reported the incident.

The single issue for review is whether the trial court erred by failing to include "attempted use of force" in its instruction on self-defense. The state argues that the facts in evidence did not warrant the inclusion of the "attempted use of force" language.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury, which dictates that all issues of fact be tried and determined by twelve jurors. U.S. Const. amend VI; Tenn. Const. Art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (Tenn. 1939). This right encompasses the defendant's right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harrison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30.

Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). When the evidence in the record fairly raises or supports the defendant's theory of defense, the trial court is compelled to instruct the jury on the issue. Manning v. State, 500 S.W.2d 913, 915-16 (Tenn. 1973); see also Almonrode v. State, 567 S.W.2d 184, 187 (Tenn. 1978). This court has added that "due process requires that a criminal defendant be afforded a meaningful opportunity to present a complete defense, which includes the right to have the jury instructed regarding fundamental defenses raised by the evidence." State v. Nevens, No. M2000-00815-CCA-R3-CD, (Tenn. Crim. App. at Nashville, April 27, 2001); see also Tenn. Code Ann. § 39-11-203(c),(d).

Whether the evidence has raised a defense and, therefore, requires a jury instruction depends upon an examination of the evidence in a light most favorable to the defendant. State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998). Tennessee Code Annotated section 39-1-611 provides, in pertinent part, as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. §39-11-611(a). Here, the evidence raised the issue of self-defense. Thus, the trial court was required to, and did, charge the jury on self-defense. The trial court instructed the jury as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense. When a person is assaulted, by the use of force, in such a way as to create in his or her mind a reasonable belief that he or she is in imminent and actual danger of death or serious bodily injury, he or she will be justified in using force to defend himself or herself even to the extent of killing another human being. The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of unlawful force.

The instruction did not include that portion of the statute which provides that one may defend himself against another's attempted use of force. The defendant argues that the evidence presented warranted an instruction of "attempted use of force."

The statute, of course, provides that a person may use force to repel another's use of force or attempted use of force. After the trial court completed its charge, but before the jury retired to deliberate, defense counsel pointed out the omission and asked the trial court to clarify the instruction. The trial court declined without explanation. In the order denying the motion for new trial, the trial court made the following observation:

> The instructions given were accurate, consistent with Tennessee's Pattern Jury Instructions, and adequately conveyed the essential concepts of the defense. After reviewing the entire jury instruction and the proof adduced at trial, this Court finds that any failure to include the phrase "attempted use of force" did not affect the result of the trial and is harmless error.

In State v. John D. Joslin, No. 03C01-9510-CR-00299 (Tenn. Crim. App., at Knoxville, Sept. 22, 1997), the defendant was charged with first degree murder in the shooting death of his former employee. There was proof that his employee had threatened the defendant on several occasions prior to the shooting and, according to the defendant, the victim suddenly stopped his vehicle in front of the defendant, exited his vehicle, placed his hand in his pocket and began to walk in his direction. The defendant pointed a gun out his car window and warned the victim to stop. When the victim did not respond, the defendant fired a warning shot over the victim's head. When the victim lunged, the defendant fired a fatal shot. The trial court omitted the phrase "attempted use of force" from the first paragraph of its instruction on self-defense but used the phrase later in the instructions. This court held that "the trial court's failure to include the 'attempted use of force' language at the beginning of the instruction was error," but ruled that the error was harmless because the language was included in another portion of the charge.

Here, the defendant claimed that he believed the victim was rising to retrieve a weapon from the truck. Although there was no evidence that the victim actually used force against the defendant,

there was proof of his attempt to do so. As noted, a trial court must instruct the jury regarding any defense fairly raised by the proof. Manning, 500 S.W.2d at 916. In our view, the issue of the victim's attempted use of force should have been presented to the jury.

When the error is of constitutional dimensions, as is the case here, reversal is required unless the error is harmless beyond a reasonable doubt. State v. Carpenter, 773 S.W.2d 1 (Tenn. Crim. App. 1989). Jury instructions must be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Erroneous jury instructions require a reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586 (Tenn. Crim. App. 1992).

In Joslin, this court found that the omission of the "attempted use of force" language was harmless error because the trial court's instruction properly focused the jury's inquiry on the reasonableness of the defendant's beliefs. The panel emphasized that the "attempted use of force" language was used in subsequent parts of the instruction. Here, however, the trial court omitted altogether the phrase "attempted use of force." Because the defendant contended only that the victim attempted to use force, the trial court's omission of the "attempted use of force" language essentially deprived the defendant of right to present a defense. Under these circumstances, the error was not harmless beyond a reasonable doubt.

Accordingly, the judgment of the trial court is reversed and the cause remanded.

_____
GARY R. WADE, PRESIDING JUDGE

-6-